**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Tracey Mercado, individually and on behalf of
all others similarly situated;

       Plaintiff,

  v.

VERDE ENERGY USA, INC.,

       Defendant.

 Civil Action No. 18-CV-02068

**Class Action Complaint**

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff, Tracey Mercado, individually and on behalf of all others similarly situated, alleges as and for her Class Action Complaint against defendant Verde Energy USA, Inc., ("Verde" or "Defendant"), upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by her attorneys, as follows:

## NATURE OF THE ACTION

1.  This action seeks to redress Defendant's deceptive and improper pricing practices that have caused thousands of Illinois consumers to pay considerably more for their electricity than they should otherwise have paid.

2.  Defendant has taken advantage of the deregulation of the retail electricity market in Illinois by luring consumers into switching energy suppliers with false promises that it offers variable rates for electricity that are based on market conditions. Defendant lures consumers into switching by offering a teaser rate that is lower than local utilities' rates for electricity supply. When the teaser rate expires after a couple of months, Defendant switches customers to a

variable rate, which it represents in its "Terms and Conditions of Service" is based on market conditions. Yet the rate Defendant charges is ***not*** based on market conditions but is instead an inflated rate based on Defendant's price gouging.

3.     Defendant's representations are deceptive. In fact, Defendant's variable rates are substantially higher than those otherwise available in the energy market, and are not reflective of the market conditions on which Defendant purports to base its variable rates.

4.     Specifically, when the market price goes down, Verde's rate remains at an inflated level significantly higher than the market rate.

5.     This unfair and deceptive scheme of charging inflated electric prices while failing to pass-along decreases is intentionally designed to maximize revenue for Verde.

6.     Verde's business model is simple: after the teaser rate expires, it charges exorbitant rates that are not based on market conditions. As a result of Verde's unfair and deceptive overcharging scheme, Illinois consumers are being fleeced millions of dollars in exorbitant charges for electricity.

7.     This suit is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS § 505/1 *et seq.* and the common law of Illinois on behalf of a class of Verde customers (the "Class") in the State of Illinois who were charged a variable rate for electricity at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment. Through its deceptive and unconscionable practices, Verde bilked the class, tens of thousands of current and former customers with variable-rate electricity plans, out of millions of dollars. Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

8.    Tracey Mercado is a natural person and citizen of Illinois.  Plaintiff Mercado was a customer of Verde Energy from approximately November 2014 through August 2017, and as a result of Defendant's deceptive conduct, she incurred excessive charges for electricity.

9.    Verde Energy is a corporation organized under the laws of Delaware with its principal office in Norwalk, Connecticut.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class (the "Class Members") are citizens of States different from Defendant.

11.    This Court has general personal jurisdiction over Defendant.  Defendant does business in Illinois through continuous, permanent, and substantial activity in Illinois.

12.    This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Illinois consumers.

13.    Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391.  Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

## SUBSTANTIVE ALLEGATIONS

### Energy Deregulation and Resulting Wide-Spread Consumer Fraud and Improper Pricing Practices

14.    In 1997, Illinois deregulated the market for retail electricity supply, a major break with past policy.  Prior to deregulation, electricity was supplied and distributed solely by local

utility companies. Over the last several years, a number of states, including Illinois, have begun to change the regulations in the energy industry purportedly to enhance competition between energy providers. The purpose of deregulation is to enhance competition between energy providers in the hopes that Alternative Retail Electric Suppliers ("ARESs") such as Defendant would help to lower energy costs.

15.     As part of the deregulation plan, ARESs such as Verde are subject to minimal regulation and do not have to seek approval of its rates, nor the method by which it set its rates, with the Illinois Commerce Commission ("ICC").

16.     ARESs play a middleman role: they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers. However, ARESs do not deliver energy to consumers. Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer. ARESs merely buy electricity at the wholesale rate and then sell that energy to end-users with a mark-up. Thus, ARESs are essentially brokers and traders: they neither make nor deliver electricity, but merely buy electricity from a producer and resell it to consumers.

17.     ARESs such as Verde have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance by purchasing futures and forward contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow ARESs to use these and other innovative purchasing strategies to reduce electricity costs.

18.     If a customer switches to an ARES, the customer will have his or her energy "supplied" by the ARES, but still "delivered" by their existing utility.  The customer's existing utility continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

19.     After a customer switches to an ARES, the customer's energy supply charge—based on a customer's kilowatt hour usage—is calculated using the supply rate charged by the ARES and not the regulated rate charged by customer's former utility.  The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") multiplied by the rate.  For example, if a customer uses 300 kWh at a rate of 11.0¢ per kWh, the customer will be billed $33.00 (300 x $.11) for her energy supply.

20.     Almost all states that deregulated their energy markets did so in the mid- to late 1990s.  This wave of deregulation was frantically pushed by then-corporate behemoth Enron.  For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .
> It can be done quickly.  The key is to get the legislation done fast.[1]

21.     Operating under this sense of urgency, the states that deregulated suffered serious consumer harm.  For example, in 2001, forty-two states had started the deregulation process or were considering deregulation.  Today, the number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia.  Even within those states, several have

---

[1] Christopher Keating, *Eight Years Later . . . "Deregulation Failed"* HARTFORD COURANT, Jan. 21, 2007.

recognized deregulation's potential harm to everyday consumers and thus only allow large-scale consumers to shop for their energy supplier.

22.     Responding to shocking energy prices, many key players that supported deregulation now regret the role they played.  For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed.  We are not going to give up on re-regulation till it is done."[2]

23.     A Connecticut leader who participated in that state's foray into energy deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't know what world we are living in.  We did.[3]

24.     Verde takes advantage of the deregulation and the lack of regulatory oversight in the energy market by deceptively charging Illinois consumers exorbitant rates for electricity.  In theory, energy deregulation allows consumers to shop around for the best energy rates, and it allows consumers to take advantage of market-based rates that decline when wholesale costs decline.  However, Verde exploits deregulated markets with false promises that it offers variable rates based on market conditions in order to deceive consumers into purchasing energy from it.  In fact, Verde's rates are substantially higher than rates charged by other EGSs and by local utilities, and they are not reflective of changes in wholesale rates.

25.     One of deregulation's main unintended consequences has been the proliferation of ARESs such as Verde, whose business model is primarily based on deception.

---

[2] David Hill, *State Legislators Say Utility Deregulation Has Failed in its Goals*, THE WASHINGTON TIMES, May 4, 2011.

[3] Keating, *supra* note 5.

26.     As a result, regulators have also begun to call out the deceptive and improper pricing practices that pervade deregulated energy markets.  For example, in 2014 New York's Public Service Commission ("NYPSC") concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[4]  The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service . . . ."[5]

27.     The deceptive pricing practices of ARESs such as Verde have been devastating to consumers nationwide.  For example, based on data recently provided by the major New York electric and gas utilities, the NYPSC calculated that for the 30 months from December 30, 2013 to June 30, 2016 New York's energy service company ("ESCO") customers paid nearly $820 million more for energy than they would have had they stayed with their local utility.  New York's low-income consumers have also been hit hard.  The utilities reported that low-income ESCO customers paid almost $96 million more than residential utility customers for the same period.

28.     Based in large part on the flood of consumer complaints, negative media reports, and data demonstrating massive overcharges the NYPSC announced in December 2016 an evidentiary hearing to consider primarily whether ESCOs should be "completely prohibited from

---

[4] 2014 NY PSC Op No. 12-M-0476 at 4 (Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets) (Feb. 20, 2014).

[5] *Id*. at 11.

serving their current products" to New York residential consumers.[6]   They essentially intended to reassess whether New York's deregulation experiment has failed everyday consumers.

29.     Verde lures consumers to switch from their local utility companies or other energy suppliers, promising that it will offer market based variable rates for electricity.  Indeed, Verde's scheme falsely promises energy rates based on "market conditions."  However, in reality, after switching to Verde Energy as a supplier, consumers' energy bills increase dramatically.

30.     The end result is that, instead of benefitting from switching to Verde, a typical customer loses out – to the tune of hundreds or even thousands of dollars per year.  Thus, Verde deceptively causes its customers to pay considerably more for electricity services than they should have and otherwise would have paid.

## Verde Energy Charges Deceptively High Electricity Rates

31.     Verde engages in a classic bait and switch deception scheme.  Verde lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates.

32.     Plaintiff's experience was typical.  In or around October or November 2014, a Verde representative solicited Ms. Mercado at her residence to switch from her utility company, Commonwealth Edison, to Verde with promises of a more competitive rate if she switched to Verde.

33.     In or around November 2014, Plaintiff made the switch to Verde for electricity, and her and Verde's contractual agreement is memorialized in Defendant's standard "Terms and Conditions of Service" (attached as Exhibit "A"), which was confirmed verbally with Plaintiff in audio.  Thereafter, Plaintiff paid the rate she was charged.

---

[6] 2016 NY PSC Op No. 12-M-0476 at 3 (Notice of Evidentiary and Collaborative Tracks and

34. Plaintiff was initially placed on an introductory fixed rate plan for electricity for four months.

35. After the fixed rate expired, Plaintiff was switched to a variable rate plan. Verde's Terms and Conditions of Service makes an express link between the Variable rate charged by the company and the underlying wholesale market rate, stating the variable rate "may change monthly with market conditions."

36. As such, a reasonable consumer, like Plaintiff Mercado, would understand that Verde's variable rates fluctuate in a manner correlated with the underlying wholesale market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

37. Instead, and contrary to reasonable consumer expectation, Verde used its variable rates as a pure profit center, increasing the rates charged to Plaintiff and Class Members when wholesale prices rose, but staying at a level significantly higher than the wholesale market rates when the wholesale prices fell.

38. Any reasonable consumer would understand based on these representations that Verde's variable rate would reflect Verde's cost for purchasing electricity at wholesale, and that the variable rate would be competitive with the rate offered by the local utility and other EGSs.

39. Yet, the rates Verde charged Plaintiff were not commensurate with rates otherwise available in the market or with changes in wholesale rates.

40. Plaintiff paid Verde's variable rate through August 2017. In or around September 2017, Plaintiff cancelled her service with Verde and returned to her former local utility, ComEd. The following table identifies the billing periods during the time Plaintiff was on Verde's

Deadline for Initial Testimony and Exhibits) (December 2, 2016).

variable rate plan, the variable rates Verde charged Plaintiff, and the corresponding rates ComEd

would have charged for electricity (which is a reasonable representation of the available market

rates):

| Billing Period End Date[7] | Verde Rate ($/kWh) | ComEd Rate[8] ($/kWh) | Difference (%) |
|---|---|---|---|
| 4/30/2015 | $ 0.1049 | $ 0.0907 | 16% |
| 5/30/2015 | $ 0.0999 | $ 0.0897 | 11% |
| 6/30/2015 | $ 0.0999 | $ 0.0778 | 28% |
| 7/29/2015 | $ 0.0999 | $ 0.0735 | 36% |
| 8/28/2015 | $ 0.0999 | $ 0.0778 | 28% |
| 9/28/2015 | $ 0.0999 | $ 0.0708 | 41% |
| 10/27/2015 | $ 0.0999 | $ 0.0722 | 38% |
| 11/30/2015 | $ 0.0999 | $ 0.0729 | 37% |
| 1/4/2016 | $ 0.0999 | $ 0.0802 | 25% |
| 2/3/2016 | $ 0.0999 | $ 0.0801 | 25% |
| 3/1/2016 | $ 0.0999 | $ 0.0803 | 24% |
| 3/30/2016 | $ 0.1149 | $ 0.0815 | 41% |
| 4/28/2016 | $ 0.1149 | $ 0.0806 | 42% |
| 5/31/2016 | $ 0.1049 | $ 0.0832 | 26% |
| 6/29/2016 | $ 0.1049 | $ 0.0741 | 42% |
| 7/29/2016 | $ 0.0999 | $ 0.0767 | 30% |
| 8/29/2016 | $ 0.1049 | $ 0.0747 | 40% |
| 9/29/2016 | $ 0.1049 | $ 0.0749 | 40% |
| 10/26/2016 | $ 0.1049 | $ 0.0710 | 48% |
| 11/30/2016 | $ 0.1049 | $ 0.0710 | 48% |
| 12/30/2016 | $ 0.1049 | $ 0.0710 | 48% |
| 2/1/2017 | $ 0.1049 | $ 0.0703 | 49% |
| 3/3/2017 | $ 0.1049 | $ 0.0703 | 49% |
| 3/30/2017 | $ 0.1049 | $ 0.0740 | 42% |
| 4/28/2017 | $ 0.0899 | $ 0.0703 | 28% |
| 5/31/2017 | $ 0.1049 | $ 0.0737 | 42% |
| 6/30/2017 | $ 0.1049 | $ 0.0826 | 27% |
| 7/31/2017 | $ 0.1049 | $ 0.0818 | 28% |

---

[7] The first day of the period is approximately thirty days before.

[8] ComEd utility Price to Compare found at:
https://www.pluginillinois.org/FixedRateBreakdownComEd.aspx.

| 8/29/2017 | $ 0.1049 | $ 0.0829 | 26% |
|---|---|---|---|

41.     In the electricity market, the rates Illinois utilities like Com.Ed. charge is an accurate reflection of market-based rates.  In fact, Illinois utilities purchase electricity for their customers on the spot or daily market at the same market price per kilowatt hour other electricity retailers, including Verde, can purchase electricity for its customers.

42.     For utility customers in Illinois who do not get their electricity supply from an ARES, the utilities buy electricity from the Illinois wholesale electricity markets.

43.     That Verde's variable rate is not in fact a rate that changes with market conditions is demonstrated by the fact that Verde's rate stayed significantly higher than ComEd's rates during the entire time Plaintiff paid Verde's variable rate.  In fact, there are numerous months where Verde's rate was ***over 45% higher*** than the ComEd rate.

44.     While ComEd and Verde may not purchase electricity in precisely the same manner, over time, the costs they incur should be commensurate.  In fact, there is a highly competitive electricity market where Defendant can purchase electricity for future use (either in a physical purchase of electricity for future use or as a swap transaction), and therefore, its cost for purchasing electricity reflects market prices and conditions, albeit over a longer term than daily spot rates.  Hence, while ComEd's rates may not precisely match Verde's rate, they should be commensurate.

45.     A reasonable consumer understands that the price the local utility or other ARES charges is part of market conditions and that a price based on market conditions is consistent with the price charged by the local utility or other ARES.  However, Verde's prices are substantially higher than local utilities' rates, as well as the rates other ARESs charge.

46.     The truth is Verde does not price its electricity based on market conditions as stated in its contract.  The following table is a pre-discovery calculation of the variable rates Verde charged Plaintiff, and the applicable wholesale market rate from the PJM market (which is a proper measure of market prices):

| Billing Period End Date[9] | Verde Rate ($/kWh) | Wholesale Market Rate[10] ($/kWh) | Difference (%) |
|---|---|---|---|
| 4/30/2015 | $ 0.1049 | $ 0.0531 | 98% |
| 5/30/2015 | $ 0.0999 | $ 0.0527 | 90% |
| 6/30/2015 | $ 0.0999 | $ 0.0503 | 99% |
| 7/29/2015 | $ 0.0999 | $ 0.0575 | 74% |
| 8/28/2015 | $ 0.0999 | $ 0.0529 | 89% |
| 9/28/2015 | $ 0.0999 | $ 0.0533 | 87% |
| 10/27/2015 | $ 0.0999 | $ 0.0491 | 104% |
| 11/30/2015 | $ 0.0999 | $ 0.0492 | 103% |
| 1/4/2016 | $ 0.0999 | $ 0.0570 | 75% |
| 2/3/2016 | $ 0.0999 | $ 0.0600 | 67% |
| 3/1/2016 | $ 0.0999 | $ 0.0577 | 73% |
| 3/30/2016 | $ 0.1149 | $ 0.0571 | 101% |
| 4/28/2016 | $ 0.1149 | $ 0.0590 | 95% |
| 5/31/2016 | $ 0.1049 | $ 0.0559 | 87% |
| 6/29/2016 | $ 0.1049 | $ 0.0578 | 81% |
| 7/29/2016 | $ 0.0999 | $ 0.0677 | 48% |
| 8/29/2016 | $ 0.1049 | $ 0.0664 | 58% |
| 9/29/2016 | $ 0.1049 | $ 0.0649 | 62% |
| 10/26/2016 | $ 0.1049 | $ 0.0659 | 59% |
| 11/30/2016 | $ 0.1049 | $ 0.0572 | 83% |
| 12/30/2016 | $ 0.1049 | $ 0.0663 | 58% |
| 2/1/2017 | $ 0.1049 | $ 0.0633 | 66% |
| 3/3/2017 | $ 0.1049 | $ 0.0570 | 84% |
| 3/30/2017 | $ 0.1049 | $ 0.0628 | 67% |
| 4/28/2017 | $ 0.0899 | $ 0.0599 | 50% |
| 5/31/2017 | $ 0.1049 | $ 0.0610 | 72% |
| 6/30/2017 | $ 0.1049 | $ 0.0629 | 67% |
| 7/31/2017 | $ 0.1049 | $ 0.0641 | 64% |

---

[9] The first day of the period is approximately thirty days before.

[10] The Wholesale Market Rate is comprised of the Weighted LMP and Other PJM Charges (i.e., Capacity, Ancillary Services, etc.) and also includes the cost of renewable energy certificates, which is a very small component of the overall costs Verde pays.

| 8/29/2017 | $ 0.1049 | $ 0.0588 | 78% |

47.     Thus, Verde's statements with respect to the electricity rates it means to charge are materially misleading because consumers do not receive a market-based price.  Instead, consumers are charged rates that are substantially higher.  Verde fails to disclose this material fact to its customers.

48.     That Verde's variable rate is not in fact a rate that fluctuates with market conditions is demonstrated by the fact that Defendant's rate was significantly higher than the wholesale rate.

49.     That Verde's rates do not reflect market costs for wholesale electricity is also demonstrated by the disconnect between changes in wholesale electricity prices and Verde's costs.  While the wholesale (PJM spot market) rate might show more short-term fluctuations than Verde's costs, overtime, the wholesale (PJM spot market) rate is an accurate reflection of wholesale market costs.

50.     The cost of wholesale electricity is the primary component of costs Verde incurs. The cost that Verde pays for renewable energy certificates are insignificant in terms of the overall costs Verde incurs to provide retail electricity, and do not fluctuate greatly over time.  Therefore, these other cost factors cannot explain the drastic increases in Verde's variable rate or the reason its rates are disconnected from changes in wholesale costs.

51.     That Verde's variable rate does not reflect market costs for wholesale electricity is also demonstrated by the disconnect between fluctuations in wholesale electricity prices and costs and Verde's rates.  As the wholesale market price fluctuates, Verde's variable rate does not correspond to those fluctuations.  Instead, Verde's variable rate remains significantly higher than the corresponding market price.  As evidenced by the above chart, there were multiple months

where Plaintiff's electricity rate with Verde was *over 80-100% higher* than the market rate during that same billing period.

52.     As set forth above, Verde breaches its customer contract as its consumers do not receive a price based on market conditions.  Instead, consumers are charged rates that are substantially higher those of competitors and untethered from market conditions.  Verde intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Ms. Mercado—who knows the truth about Verde's exorbitant rates would choose Verde as an electricity supplier.

53.     Defendant Verde's statements and omissions regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer who knows the truth about Verde's exorbitant rates would choose Verde as an electricity supplier.

54.     Verde intentionally makes these misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would rely upon its statements and switch their electricity supplier to Verde.

55.     In fact, all that Verde offers customers is electricity delivered by local utilities, commodities that have the exact same qualities as electricity supplied by other ARESs or local utilities.  There is nothing to differentiate Verde Energy from other ARESs or local utilities, and the potential for a price based on market conditions is the only reason any reasonable consumer would enter into a contract for electricity with Verde.

56.     Verde knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market based were made for the sole purpose of inducing consumers to sign up for Verde's electricity supply so that it can reap

outrageous profits to the direct detriment of Illinois consumers without regard to the consequences high utility bills cause such consumers. As such, Verde's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

57.     Verde's misstatements and omissions caused injury to Plaintiff because she believed that her rate would be based on market conditions when switching from Commonwealth Edison to Verde's electricity plan. Plaintiff would not have enrolled in Verde's plan but for its false misrepresentations. Had Plaintiff known that the rates she would be charged by Verde would be substantially higher than her local utility provider (and not based on market conditions), she would not have made the decision to switch.

58.     Had Verde Energy charged Plaintiff a rate that was actually based on market conditions, Plaintiff would have been charged a substantially lower rate, and she was injured accordingly when she paid her bill.

59.     Defendant's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.* and the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## **CLASS ALLEGATIONS**

60.     Plaintiff brings this action pursuant to Illinois law on behalf of herself and all other similarly situated Verde customers in the State of Illinois who were charged a variable rate for electricity at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.

61. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or complaint.

62. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

63. This action is properly maintainable as a class action. The proposed Class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. there are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members. Specifically, the common questions of fact and law include:

      i.       whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq*.;

      ii.       whether Defendant breached its contract with Illinois consumers by charging variable rates not based on market conditions;

      iii.       whether Defendant is being unjustly enriched by deceptively charging rates substantially over those available in the market;

      iv.       whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

      v.       whether Defendant should be enjoined from continuing to charge variable rates not based on market conditions.

64.     The proposed lead Plaintiff's claims are typical of those of the proposed class because the proposed lead Plaintiff's claims are based upon the same facts and circumstances (practice or course of conduct) that gives rise to the claims of the other class members and based upon the same predominate legal theories.

65.     The representative Plaintiff can adequately and fairly represent the class.  No conflict of interest exists between the representative Plaintiff and the Class Members because Defendant's alleged conduct affected them similarly.

66.     The Plaintiff and her chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution.  In addition, the Plaintiff's attorneys are competent in the areas of law relevant to this Complaint and have sufficient experience and resources to vigorously represent the Class Members and prosecute this action.

67.     A class action is superior to any other available method for adjudicating this controversy.  The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) to keep the courts from being inundated by hundreds or thousands of repetitive cases, and (iii) to reduce transactions costs so that the injured class members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## CLAIMS FOR RELIEF

### COUNT I
**(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*)**

68.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

69.     815 ILCS § 505/2 declares unlawful "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce[.]"

70.     Verde knowingly and willfully misrepresented to Plaintiff and the Class that its rates are based on market conditions when its rates are not, in fact, based on market conditions.

71.     Verde knowingly and willfully failed to inform consumers of the material fact that its rates are substantially higher than those otherwise available in the market, and intends that consumers rely upon the deception.

72.     Verde's deception caused Plaintiff and the class to pay substantially higher rates than those otherwise available in the market.

73.     Verde made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

74.     Plaintiff and the other members of the Class entered into agreements to purchase electricity from Verde for personal use and suffered ascertainable loss as a direct and proximate

result of Defendant's actions in violation of Illinois Consumer Fraud and Deceptive Business Practices Act.

75.     As a consequence of Defendant's wrongful actions, Plaintiff and the other members of the Class suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Verde charged a rate for electricity based on market conditions or had they not switched to Verde from their previous supplier.

76.     Plaintiff and other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Verde if the true facts concerning its rates had been known.

77.     Through the conduct described above, Verde has engaged in deceptive acts and practices that resulted in injury to Plaintiff and the other members of the Class.

78.     By reason of the foregoing, Verde has violated ICFA and should be enjoined from continuing to fail to disclose that its rates are substantially higher than those otherwise available in the market and misrepresenting that its rates are based on market conditions.

79.     Verde is also liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees and costs.

80.     Verde's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other members of the Class.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## COUNT II
### (Breach of Contract)

81.    Plaintiff incorporates by reference paragraphs 1 to 67 as if fully set forth herein.

82.    Plaintiff and the Class entered into a valid contract with Verde for the provision of electricity.

83.    Pursuant to the Agreement, Verde agreed to charge a variable rate for electricity based on market conditions.

84.    Pursuant to the Agreement, Plaintiff and the Class paid the variable rates charged by Verde for electricity.

85.    However, Verde failed to perform its obligations under the Agreement because it charged variable rates for electricity that were not based on market conditions.

86.    Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was substantially higher than they would have been had Verde based its rates on market conditions.

87.    By reason of the foregoing, Verde is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT III
### (Unjust Enrichment)
### (In the Alternative to Count II)

88.    Plaintiff incorporates by reference paragraphs 1 to 67 as if fully set forth herein.

89.    If the Court finds no contract existed between Plaintiff and Defendant, Plaintiff brings this claim for unjust enrichment.

90. By engaging in the conduct described above, Verde has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and the other members of the Class.

91. It would be unjust and inequitable for Defendant to retain the payments Plaintiff and the Class made for excessive electricity charges.

92. By reason of the foregoing, Verde is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of which shall be determined at trial, plus attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) Issue an order certifying the Class defined above, appointing the Plaintiff as Class representative, and designating his Attorneys as Class Counsel;

(b) Find that Verde has committed the violations of law alleged herein;

(c) Enter an order granting monetary relief and damages on behalf of the Class;

(d) Determine that Verde has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(e) Determine that Verde breached the contract with the Class and enter an appropriate order awarding monetary and injunctive relief;

(f) Enter an order granting all appropriate relief on behalf of the Class under the applicable state laws;

(g) Render an award of compensatory damages, the amount of which is to be determined at trial;

(h) Render an award of punitive damages;

(i) Enter judgment including interest, reasonable attorneys' fees, costs, and expenses; and

(j)     Grant all such other relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

/s/Richard L. Miller II
Edward A. Wallace
Richard L. Miller II
**WEXLER WALLACE LLP**
55 W. Monroe Street
Suite 3300
Chicago, IL 60603
(312) 346-2222
(312) 346-0022
eaw@wexlerwallace.com
rlm@wexlerwallace.com

Jonathan Shub
Kevin Laukaitis
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, Pennsylvania 19107
(215) 238-1700
jshub@kohnswift.com
klaukaitis@kohnswift.com

Daniel K. Bryson
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
dan@wbmllp.com

Gregory F. Coleman (*Pro Hac Vice* Application Forthcoming)
**GREG COLEMAN LAW, P.C.**
First Tennessee Plaza
800 S. Gay Street. Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0090
Facsimile: (865) 522-0049
greg@gregcoleman.law

Jason T. Brown
**JTB LAW GROUP, LLC**
155 2nd Street, Suite 4
Jersey City, NJ 07302
Phone: (201) 630-0000
Fax: (855) 582-5297
jtb@jtblawgroup.com

**Attorneys for Plaintiff and the Class**